1  | Lauri S. Thompson (Bar No. 6846)
   | Laraine Burrell (Bar No. 8771)
2  | Shauna Welsh (Bar No. 11320)
   | GREENBERG TRAURIG, LLP
3  | 3773 Howard Hughes Parkway
   | Suite 400 North
4  | Las Vegas, Nevada 89169
   | Telephone: (702) 792-3773
5  | Facsimile: (702) 792-9002

6

7  | Counsel for Switch Communications Group LLC

8  | **UNITED STATES DISTRICT COURT**

9  | **DISTRICT OF NEVADA**

10 | Switch Communications Group, LLC, a
   | Nevada limited liability company.          Case No.

11 | v.                                          **PLAINTIFF SWITCH**
   |                                             **COMMUNICATIONS' APPLICATION**
12 |                                             **FOR TEMPORARY RESTRAINING**
   |                                             **ORDER AND MOTION FOR**
13 | Dorian Banks, an individual.                **PRELIMINARY INJUNCTION**

14

15

16

17        Plaintiff Switch Communications Group, LLC., through counsel, hereby moves the

18  Court for (1) an *ex parte* temporary restraining order requiring Defendant to immediately

19  cease and desist all use of Plaintiff's names, trademarks and domain names and requiring

20  the domain name registrar to transfer the <switch.net> domain name ("Infringing Domain

21  Name") to Plaintiff and place such Infringing Domain Name on hold; (2) a preliminary

22  injunction requiring Defendant to transfer the Infringing Domain Name to Plaintiff; and (3) a

23  preliminary injunction requiring the current domain name registrar(s) to transfer the

24  Infringing Domain Name to Plaintiff.

25        This Motion is made pursuant to Rule 65 of the Federal Rules of Civil Procedure and

26  is based upon the attached Memorandum of Points and Authorities, the Declaration of

27  Thomas Morton ("Morton Decl.") and the Declaration of Laraine M. I. Burrell ("Burrell

28

GREENBERG TRAURIG, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

1  Decl."), the papers and pleadings on file herein and any oral argument that this Court may

2  allow.

3          **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S**

4      **MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

5  **I.**     **INTRODUCTION AND STATEMENT OF GOOD CAUSE IN COMPLIANCE WITH**

6      **LR 7-5**

7        This Motion is brought under Plaintiff's claims for violation of the Anticybersquatting

8  Consumer Protection Act (the "ACPA"), trademark infringement, and unfair competition

9  under the Lanham Act (15 U.S.C. §§ 1114 and 1125) and trademark infringement under

10  Nevada law (collectively, the "Relevant Claims"). Plaintiff's Motion arises from Defendant's

11  unauthorized use of the Plaintiff's marks and Defendant's registration of the Infringing

12  Domain Name.

13        Defendant registered and uses, or intends to use in bad faith the Infringing Domain

14  Name and Plaintiff's marks. Defendant is likely to deceive the public into believing that

15  Defendant is somehow authorized by or affiliated with Plaintiff's well-known company when

16  he is not. Defendant is diluting Plaintiff's well-known marks and is wrongfully benefiting and

17  profiting from Plaintiff's goodwill.

18        More egregiously, Defendant offered to sell the Infringing Domain Name to Plaintiff

19  in violation of the ACPA, and if Plaintiff refused to purchase the domain name Defendant

20  threatened to sell it to third parties, including a group situated abroad.

21        Therefore, Plaintiff seeks a temporary restraining order and a preliminary injunction

22  requiring the transfer of the Infringing Domain Name to Plaintiff and enjoining Defendant

23  from continuing his infringement of Plaintiff's marks during the pendency of this action.

24        Plaintiff is seeking a temporary restraining order *ex parte* to avoid irreparable injury

25  that will result if Defendant receives advance notice of Plaintiff's request. *See* Burrell Decl.,

26  attached hereto as **Exhibit 1**, at ¶¶ 3-5. An *ex parte* order will prevent Defendant from

27  transferring the Infringing Domain Name to other registrars and/or other registrants during

28  the pendency of this action. As soon as Defendant receives notice of this action, he could

2.

GREENBERG TRAURIG, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

1   easily and nearly instantaneously transfer the registration of the Infringing Domain Name

2   from the current registrar to any number of other registrars located outside the United

3   States as well as to other registrants unwilling to abide by this Court's orders.[1]   In fact,

4   Defendant has already threatened to sell the domain name to third parties, including a

5   foreign entity.  *See* Emails attached as **Exhibit 1** to the Morton Decl., attached hereto as

6   **Exhibit 2.**

7        This is all particularly likely where, as here, the Defendant is foreign.  If this were to

8   occur, Plaintiff would be deprived of the ability to recover registration of the Infringing

9   Domain Name and the ability to enforce its intellectual property rights.  Accordingly, this

10  Court should enter a temporary restraining order directing the Defendant and the Registrar

11  to transfer the Infringing Domain Name to Plaintiff during the pendency of this action,

12  thereby preventing any further migration of the Infringing Domain Name and the need to file

13  additional lawsuits to chase the Infringing Domain Name in an attempt to recover the

14  Infringing Domain Name.

15  **II.      STATEMENT OF FACTS**

16      **A.      Facts Regarding Plaintiff.**

17        Plaintiff Switch Communications Group LLC is a Nevada corporation with its

18  principal place of business in Las Vegas, Nevada.  Switch builds and operates the world's

19  most powerful data center and technology ecosystems.  *See* Morton Decl., attached hereto

20  as **Exhibit 2**, at ¶ 3.

21        Switch owns variants of the mark SWITCH, and has obtained federal mark

22  registrations for a number of SWITCH marks, including but not limited to:

23

24

25

26        [1]  While registrars who are accredited by the Internet Corporation of Assigned Names and Numbers

27  ("ICANN") are required to subscribe to ICANN's Uniform Dispute Resolution Policy ("UDRP"), which requires
    the registrar to obey and follow the order of a court of "competent jurisdiction" over the registrant to transfer a

28  domain name, as to those registrars that are not within the jurisdiction of the court or that do not subscribe to
    the ICANN rules, neither the Lanham Act nor the courts will have any power over them.  *See* UDRP Rule 4, at
    www.icann.org/udrp/udrp.htm.                                3.

GREENBERG TRAURIG, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

GREENBERG TRAURIG, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

(a)     SWITCH COMMUNICATIONS GROUP for providing telecommunications connections to a global computer network and colocation services (U.S. Reg. No. 3,229,168);

(b)     SWITCH T-SCIF for providing telecommunications connections to the internet and colocation services (U.S. Reg. No. 3,547,908);

(c)     SWITCH WDMD for colocation services (U.S. Reg. No. 3,540,816),

(d)     SWITCHNAP for providing telecommunications to the internet and colocation services (U.S. Reg. No. 3,547,909),

(e)     SWITCHNAP WORLD for providing telecommunications connections to the internet and colocation services (3,880,400),

(f)     SWITCHFORCE, for security guard services, designing security systems for others, security surveillance services, guard night-watch services, alarm center services, mobile and stationary security guard services, alarm rescue services, alarm rescue services; photographic surveillance services, detective agencies; interior decoration consultation, engineering and legal counseling services; development of bar-code systems; computer programming for others; computer software design for others, up-dating and maintenance of computer software (U.S. Reg. No. 3,942,121),

(g)     SWITCHSAFE for computer disaster recovery services (U.S. Reg. No. 3,946,128),

(h)     SWITCHWORKS for design and installation of computer hardware and software systems for others (U.S. Reg. No. 3,942,079),

(i)     SWITCHMOD for colocation facility development services (U.S. Reg. No. 3,984,525),

(j)     SWITCH L.D.C. for providing management of building operation systems; computer software and hardware for energy use

4.

1                 management, air conditioning and energy usage monitoring and

2                 management systems (U.S. Reg. No. 3,984,524), and

3       (k)      SWTICHMACRO-MOD for colocation facility development services

4                 (U.S. Reg. No. 3,984,966).

5 None of these federal trademark registrations has been abandoned, canceled or revoked.

6 *See id.* at ¶ 5.  None of these federal trademark registrations has been abandoned,

7 canceled or revoked.

8       Since Switch commenced operations in 2003, it has continuously used SWITCH and

9 related marks in connection with advertising and promoting its services in the United States

10 and around the world. <u>See</u> <u>id</u>. at ¶ 6.  The SWITCH name is well-known and well-

11 respected in the data center industry, and due to its size and unparalleled capabilities, has

12 been covered by CNN Money, Vegas Inc., the Wall Street Journal, and CNBC, among

13 other outlets.  Switch has spent substantial sums of money to advertise and promote the

14 SWITCH marks in print, broadcast media and on the internet through the Switch website,

15 accessible throughout the United States and around the world at <switchnap.com>. <u>See</u> <u>id</u>.

16 at ¶ 7. A true and correct copy of the home page for the Switch website is attached hereto

17 as **Exhibit 3** and is incorporated by this reference.  In addition, Switch has made extensive

18 use of the SWITCH marks on, among other things, providing telecommunications to the

19 internet and colocation services, and security guard services, designing security systems

20 for others, and security surveillance services.

21       Based on its federal trademark registrations and extensive use, Switch owns the

22 exclusive right to use its SWITCH marks in connection with telecommunications, internet

23 colocation, and other similar services. <u>See</u> <u>id</u>. at ¶ 8.  In fact, the uniqueness of Switch has

24 resulted in the SWITCH name and mark being distinctive and famous for these services.

25 <u>See</u> <u>id</u>.

26     **B.**      **Facts Regarding Defendant.**

27       Upon information and belief, Defendant Dorian Banks is an individual who resides in

28 Vancouver, British Columbia, Canada.   On or about October 15, 2011, Defendant

GREENBERG TRAURIG, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

registered the <switch.net> domain name with Enom423 Incorporated, a registrar for domain names. See WHOIS Records for <switch.net>, attached hereto as **Exhibit 4**. The domain name contains Plaintiff's famous trademark.

On or about October 31, 2011, Defendant contacted Plaintiff's employee and offered to sell Plaintiff the domain name. *See* Morton Decl, **Exhibit 2**, at ¶ 11. Defendant offered to sell the domain name for approximately $3,700. *See* **Exhibit 1** to the Morton Decl. While Plaintiff evaluated the offer to negotiate the purchase of the domain name, Defendant threatened to sell the domain name to another entity if Plaintiff did not hurry and open escrow to buy the domain name. *See* Morton Decl., ¶ 12.

### C.   Factual Background Regarding the Internet and Domain Names.

Every web site on the World Wide Web of the Internet has a unique numerical address called an Internet Protocol address, comprised of four numbers ranging from 1 to 255, separated by decimals, such as 137.34.23.198.   See e.g., America Online, Inc. v. Huang, 106 F. Supp. 2d 848, 850-53 (E.D. Va. 2000). In response to the consideration that most individual users would have difficulty remembering strings of numbers, the domain name system ("DNS") was developed to make the World Wide Web more user friendly. The DNS associates a unique alphanumerical name, the "domain name," with each Internet Protocol address.   See id.; Sporty's Farm L.L.C. v. Sportsman's Market, Inc., 202 F.3d 489, 492-93 (2d Cir. 2000).

Domain names are comprised of a letter string of up to 26 letters, known as a second-level domain ("SLD"), followed by a period (referred to in the pejorative as a "dot"), which is then followed by a generic top-level domain ("TLD").   See America Online, 106 F. Supp.2d at 850-53.  TLDs include ".com," intended for commercial use, ".net" for networks, ".org" for non-profit organizations, and ".gov" for governmental entities, among several others.  Significantly, the ".net" TLD, as well as several other TLDs, is an open domain, such that anyone can register a domain name in the ".net" TLD without oversight by the registrar. See Sporty's Farm, 202 F.3d at 493.

/ / /

The ".Net" extension is an abbreviation for "networking."  Many Internet or data-related businesses, or businesses seeking to grow the company through networking, strongly prefer to create domain names for their web sites that couple the .net TLD with an SLD comprised of their distinctive trademark.[2]  However, there is no equivalent of the telephone book or directory assistance on the Internet.  Therefore, consumers must intuitively locate a particular company's web site and, usually, guess that the company's web site is the same as its name. See Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316, 1327 (9th Cir. 1998). If a consumer cannot find a particular company's web site through this intuitive process, he will become discouraged and may fail to continue to search for a company's own web site. See id. Consequently, there is an inherent value attached to domain names that incorporate a company's trademark or marks confusingly similar to a company's trademark, such as a common misspelling.

Domain names are registered on a first-come, first-served basis. See e.g., Network Solutions, Inc. v. Umbro Int'l, Inc., 529 S.E. 2d 80, 84-85 (Va. 2000).  The process for obtaining a domain name is rather mechanical.  An individual interested in registering a domain name must contact one of the official registrars for domain names, such as Network Solutions, Inc.  If the desired domain name has not been registered, then the user may register or reserve the domain name for a fee. See id. However, there is no oversight process to ensure that the person or entity registering the domain name has any right to use the name, or to ensure that the domain name does not match a trademark held by someone other than the registrant. See id.

As a result of the fact that anyone can register any domain name as long as it is not already registered, many businesses attempt to register domain names based on their trademarks and, unfortunately, discover that the domain name employing their trademark has already been registered by another. In many cases, the domain names are registered by individuals or businesses who then attempt to sell the domain name employing the trademark back to the trademark owner. See Virtual Works, Inc. v. Volkswagen of Am.,

GREENBERG TRAURIG, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

---

[2] See http://www.name.com/domains/net                    7.

1   Inc., 238 F.3d 264, 267 (4th Cir. 2001). This conduct is referred to as "cyberpiracy" or

2   "cybersquatting." See id.

3       Unlike a traditional trademark dispute, where identical marks can be used by

4   multiple parties (e.g., *United Airlines* and *United Van Lines*), only one party can register a

5   domain name. See Victoria's Cyber Secret, Ltd. v. V. Secret Catalogue, Inc., 161

6   F.Supp.2d 1339, 1351 (S.D. Fla. 2001). Thus, the slight differences between domain

7   names and registered marks, such as misspellings or the addition of minor or generic

8   words to the disputed domain names are irrelevant to the cybersquatting analysis. See id.

9   **III.    LEGAL ARGUMENT**

10      Plaintiff is entitled to an *ex parte* temporary restraining order and a preliminary

11  injunction directing the Registrar to transfer and place on hold the Infringing Domain Name

12  pending trial. Plaintiff is also entitled to a preliminary injunction transferring the Infringing

13  Domain Name and enjoining Defendant from further registration or use of the Infringing

14  Domain Name for the pendency of the litigation.

15      To obtain a preliminary injunction, Plaintiff must show that: (1) it will suffer

16  irreparable harm if injunctive relief is not granted; (2) it is likely to succeed on the merits; (3)

17  the balance of equities tips in favor of the moving party; and (4) granting the injunction is in

18  the public interest. See Stanley v. University of Southern California, 13 F.3d 1313, 1319

19  (9th Cir. 1994). Alternatively, this Court may issue injunctive relief if it finds: (1) a

20  combination of probable success on the merits and the possibility of irreparable injury if

21  relief is not granted, or (2) the existence of serious questions going to the merits and that

22  the balance of hardships tips sharply in its favor. See GoTo.com, Inc. v. Walt Disney Co.,

23  202 F.3d 1199, 1205 (9th Cir. 2000). A "serious question" is one for which the moving party

24  has a "fair chance" of success on the merits. See Stanley, 13 F.3d at 1319. In the instant

25  case, Plaintiffs are entitled to a temporary restraining order and preliminary injunction under

26  either test.

27  / / /

28  / / /

GREENBERG TRAURIG, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

8.

GREENBERG TRAURIG, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

**A.    Plaintiff Will Suffer Irreparable Injury if the Court Does Not Grant Preliminary Injunctive Relief.**

A party seeking injunctive relief under Fed. R. Civ. P. 65 must demonstrate irreparable harm, meaning that "money damages alone will not suffice to restore the moving party to its rightful position." Clark Pacific v. Krump Constr., Inc., 942 F.Supp. 1324, 1346 (D. Nev. 1996).  In cases involving mark infringement or mark dilution, it is well settled that irreparable harm is presumed. See GoTo.com, 202 F.3d at 1209; Toys "R" Us, Inc. v. Akkaoui, 40 U.S.P.Q.2d 1836 (N.D. Cal. 1996).

Generally, in cases involving intellectual property infringement, where a likelihood of success on the merits is demonstrated, not only is irreparable harm presumed, but preliminary injunctive relief **must issue**. See Candence Design Sys. Inc. v. Avant! Corp, 125 F.3d 824, 827 (9th Cir. 1997). Any other elemental analysis is unnecessary. See id. Therefore, upon a showing of success on the merits of the Relevant Claims, Plaintiff will have met its burden in establishing irreparable harm and will be entitled to injunctive relief.

**B.    Plaintiff Is Highly Likely to Succeed on the Merits.**

Plaintiff's success on the merits is probable with respect to each of the Relevant Claims.  However, Plaintiff is only required to demonstrate a probability of success on any one of the Relevant Claims to be entitled to the relief requested.

(1)    Plaintiff Is Likely to Succeed on the Merits of Its Anti-Cybersquatting Claim.

Plaintiff is likely to succeed on the merits of its claim under the Anti-Cybersquatting protection Act (the "ACPA"). That Act provides, in pertinent part:

[A] person shall be liable in a civil action by the owner of a mark . . . if, without regard to the goods or services of the parties, that person –

(i)    has a **bad faith intent** to profit from that mark . . .; and

(ii)    registers, traffics in, or uses a domain name that –

(I)    in the case of a mark that is **distinctive** at the time of the registration of the domain name, is **identical or confusingly similar** to that mark; [or]

(II)   in the case of a famous mark that is **famous** at the time of registration of the domain name, is **identical or confusingly similar** to that mark.. . .

15 U.S.C. § 1125(d)(1)(A) (emphasis added). Thus, Defendant is liable under the ACPA if he has a bad faith intent to profit from registering, trafficking in or using as a domain name a mark that is either identical or confusingly similar to a distinctive mark or identical, confusingly similar or dilutive of a famous mark.

First, Plaintiff's marks are famous and entitled to protection. Plaintiff's trademarks are **arbitrary trademarks** because they do not suggest the goods and services offered.[3] See Entrepreneus Media, Inc. v. Smith, 279 F.3d 1135, 1141 n. 2 (9th Cir. 2002). Alternatively, Plaintiff's marks are **suggestive trademarks** because they "require imagination, thought or perception to link the trademark with the goods offered."[4] Interstellar Starship Services, 304 F.3d at 943 n.6. Generally, arbitrary and suggestive trademarks "receive automatic protection because of their inherent distinctiveness." Id.

Courts consider several factors in assessing whether a person has the requisite "bad faith intent" to profit from the mark, as defined by the ACPA, including but not limited to:

(I)   the trademark or other intellectual property rights of the person, if any, in the domain name;

(II)   the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III)   the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV)   the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V)   the person's intent to divert consumers from the mark owner's online location to a site assessable under the domain name that could harm the goodwill represented by the mark, either for commercial gain with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation or endorsement of the site;

---

[3] For example, the use of "Amazon" as an online bookstore is an arbitrary trademark. See Interstellar Starship Services, Ltd. v. Epix, Inc., 304 F.3d 936, 943 n. 6 (9th Cir. 2002).

[4] For example, the use of "Roach Motel" for insect traps is a suggestive trademark. See Interstellar Starship Services, 304 F.3d at 943 n. 6.

GREENBERG TRAURIG, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

(VI)    the person's offer to transfer, sell or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII)   the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII)  the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX)    the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous.

. . .

15 U.S.C. § 1125 (d)(1)(B).   A court is **"not limited to considering just the listed factors** when making [its] determination of whether the statutory criterion has been met.   The factors are, instead, expressly described as indicia that 'may' be considered along with other factors." Sporty's Farm, 202 F.3d at 498 (emphasis added).

In this instance, Defendant's email expressly evidences Defendant offering the Infringing Domain Name for sale to the Plaintiff, coupled with the additional threat that if Plaintiff did not hurry up and purchase the domain name, Defendant would sell it to another group. See ***.

In applying the ACPA factors, it is clear that Plaintiff will be able to demonstrate Defendant's bad faith intent: (1) Defendant has no trademark rights in the registered domain names at issue; (2) the domain name at issue does not contain any of Defendant's legal names; (3) Defendant apparently made no use of the marks contained in the domain name at issue prior to registering the domain name; (4) Defendant has not made any *bona fide* noncommercial or fair use of the domain name at issue; (5) by using marks identical or confusingly similar to Plaintiff's famous trademarks in the domain name for his infringing site, Defendant intends to divert consumers from Plaintiff's web sites and to create a likelihood of confusion as to the source, sponsorship, affiliation or endorsement of

11.

GREENBERG TRAURIG, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

1   Defendant's domain name which will undoubtedly harm the goodwill and reputation created

2   by the Plaintiff's trademarks; (6) the marks contained in the domain name at issue is

3   confusingly similar to Plaintiff's distinctive trademarks, as discussed below; and (7)

4   Defendant offered to transfer, sell or otherwise assign the domain name to Plaintiff, or any

5   third party for financial gain without having used, or having an intent to use, the domain

6   name in the bona fide offering of any goods or services.  Accordingly, at least seven of the

7   nine factors clearly weigh in favor of finding that Defendant had the requisite bad faith intent

8   to profit from the registration of domain names confusingly similar to Plaintiff's trademarks.

9           Plaintiff also satisfies the second element of its claim under the ACPA.  The domain

10  name registered by Defendant is either identical or confusingly similar to Plaintiff's

11  registered trademarks.    The Infringing Domain Name strongly resembles Plaintiff's

12  trademarks.    The Infringing Domain Name, <switch.net>, is the dominant portion of

13  Plaintiff's registered trademarks, SWITCH.  Defendant's domain name therefore satisfies

14  the "identical or confusingly similar" test of the ACPA.  Therefore, this Court should issue a

15  temporary restraining order and a preliminary injunction to protect Plaintiff's prior and

16  exclusive rights in the marks based upon the probable success of Plaintiff's ACPA claim

17  against Defendant.

18              (2)    Plaintiff Is Likely to Succeed on the Merits of Its Trademark
                      Infringement and Unfair Competition Claims.
19

20          To succeed on the merits of its trademark infringement or unfair competition claims

21  under the Lanham Act, Plaintiff must establish that Defendant's use, or intended use of

22  Plaintiff's marks is likely to cause confusion among the consuming public.  See 15 U.S.C. §

23  1114(a); Metro Publishing Ltd. v. San Jose Mercury News, 987 F.2d 637, 640 (9th Cir.

24  1993).  Such confusion can occur when the infringer's sole action was the registering of an

25  infringing domain name.  See Green Prods. Co. v. Independence Corn By-Prods. Co., 992

26  F.Supp. 1070, 1080 (N.D. Iowa 1997) (holding that the mere domain name registration of a

27  competitor's mark resulted in a likelihood of confusion).  In fact, Defendant's intent to

28  deceive the public by adopting Plaintiff's names and marks without his own valid rights in

12.

GREENBERG TRAURIG, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

1  the marks creates a presumption of confusion.  See Academy of Motion Pictures Arts and

2  Sciences v. Creative House Promotions, 944 F.2d 1446, 1456 (9th Cir. 1991).  See also

3  Lozano Enterprise v. La Opinion Publishing Co., 44 U.S.P.Q.2d 1764, 1767 (C.D. Cal.

4  1997), quoting Opticians Ass'n v. Independent Opticians, 920 F.2d 187, 193 (3d Cir. 1990)

5  (holding that a defendant's use of marks identical to the plaintiff's marks for competitive

6  services renders the confusion test under 15 U.S.C. § 1114 "open and shut").  Plaintiff is

7  entitled to injunctive relief based upon the presumption of confusion.

8             (3)     Plaintiff Is Likely to Succeed on the Merits of Its Common Law
                      Trademark Infringement Claim.
9

10          Plaintiff will likely succeed on the merits of its mark infringement claim against

11  Defendant under Nevada common law.  To show common law mark infringement, Plaintiff

12  need only show:  (a) that Plaintiff is the owner of a protectable right in the marks, and (b)

13  that Defendant's registration of the Infringing Domain Name is likely to "confuse, cause

14  mistake or deceive an 'appreciable number' of reasonable customers" with respect to the

15  marks.  A.L.M.N., Inc. v. Rosoff, 757 P.2d 1319, 1321 (Nev. 1988).

16
                          (a)     Plaintiff Has Protectable Rights in Its Marks.
17

18          As discussed above, Plaintiff has protectable rights in and to the marks based upon

19  Plaintiff's federal registrations of the marks and based upon the exclusive and continuous

20  use of the marks before or since November 2003.

21                        (b)     Defendant's Use of the Infringing Domain Name is Likely to
                                  Cause Confusion with Plaintiff's Marks.
22

23          Defendant's use, or intended use, of the Infringing Domain Name and Plaintiff's

24  marks are likely to "confuse, cause mistake or deceive an 'appreciable number' of

25  reasonable customers."  See Rosoff, 757 P.2d at 1323.  To determine the likelihood of

26  confusion between similar marks, the Supreme Court of Nevada has adopted a seven

27  factor test consisting of:  (i) similarity of marks; (ii) similarity of services; (iii) marketing

28  channels used; (iv) evidence of actual confusion; (v) strength of the mark; (vi) junior user's

GREENBERG TRAURIG, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

13.

1  intent in adopting the mark; and (vii) degree of care likely to be exercised by the purchaser.

2  Id. at 1324.

3          Plaintiff has already demonstrated the applicability of factors (i), (iii), (v), (vi) and (vii)

4  in the discussion above. See Sections III.A, III.B(1), and III.B(2), supra. With regard to the

5  fourth factor, courts do not require proof of actual confusion to find a likelihood of confusion.

6  See e.g., Drexel Enters., Inc. v. Hermitage Cabinet Shop, Inc., 266 F. Supp. 532, 537

7  (N.D.Ga. 1967). Plaintiff has not as yet found it necessary to engage in the expense of

8  conducting surveys to identify actual confusion but reserves the right to do so.

9          Plaintiff's probable success, therefore, on its common law mark infringement claim is

10  very high. As Plaintiff is the owner of strong marks with prior, continuing and exclusive

11  rights and as Defendant's use, or intended use, of the Infringing Domain Name and the

12  marks is likely to cause confusion under Nevada law, this Court should issue a temporary

13  restraining order and a preliminary injunction to preserve Plaintiff's rights in and to its

14  marks.

15  **C.    Plaintiff Has Raised Serious Questions as to the Merits, and the
       Hardships Balance in Favor of Plaintiff.**

16

17          Even if Plaintiff's success on the merits of the Relevant Claims, as discussed above,

18  was not probable, Plaintiff would be entitled to the injunctive relief requested upon a

19  showing that there are serious questions as to the merits of Plaintiff's claims and that the

20  balance of hardships weigh in Plaintiff's favor. See A&M Records, Inc. v. Napster, Inc., 239

21  F.3d 1004, 1013 (9th Cir. 2001) (citation omitted).

22          The first prong of this alternative test requires a far lower showing than probable

23  success on the merits. All that need be shown is the mere existence of serious questions

24  as to the merits of Plaintiff's claims. See A&M, 239 F.3d at 1025 (where the first prong of

25  the alternative test was met by the mere raising of meritorious issues that were the subject

26  of the claims alleged). Plaintiff meets this prong as it has raised serious questions going to

27  the merits of the Relevant Claims. These serious questions include, without limitation, all of

28  the elements of each of the Relevant Claims upon which Plaintiff has demonstrated

14.

GREENBERG TRAURIG, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

1   probable success. *See id.* (where the serious questions raised were merely elements of
2   the claims for which the plaintiffs were seeking injunctive relief).    As these serious
3   questions have already been raised in the above probable success analysis, they need not
4   be repeated here.

5       Further, the hardships strongly balance in favor of Plaintiff.   Issuance of the
6   injunction would merely require Defendant to stop using identical or confusingly similar
7   names or marks. Defendant is still permitted to register non-infringing domain names.

8       In contrast, by failing to issue the injunction, Defendant would be allowed to sell the
9   Infringing Domain Name to third parties for his financial benefit.   Also, Defendant could
10  generate business by virtue of Plaintiff's famous names and marks.  Moreover, the use
11  would also cause the dilution and tarnishment of Plaintiff's names and marks.   Plaintiff
12  would suffer a loss of control over its goodwill and reputation, over which Defendant now
13  exercises a disconcerting amount of worldwide control through the Internet.

14      Finally, issuance of the injunction will maintain the status quo. "[T]he status quo is
15  the last uncontested status which preceded the pending controversy."   Tanner Motor
16  Livery, Ltd. v. Avis, Inc., 316 F.2d 804, 809 (9th Cir. 1963), cert denied, 375 U.S. 821
17  (1963). Defendant's acts referenced in Plaintiff's Complaint occurred on or about October
18  15, 2011 and continues to the present. Accordingly, an injunction would merely return the
19  parties to the status quo that existed about one month ago, before Defendant began
20  offering to sell the Infringing Domain Name to the Plaintiff, and to third parties.

21      **D.    Protection of Consumers Weighs in Favor of Injunctive Relief.**

22      The primary goal of trademark law is to protect consumers against deception. *See*
23  Lozano, 44 U.S.P.Q.2d at 1769, citing International Order of Job's Daughters v. Lindeburg
24  & Co., 633 F.2d 912, 918 (9th Cir. 1980).  In this instance, the consequences of consumer
25  deception are potentially very grave.

26      In this instance, businesses rely on the integrity of Plaintiff's business services and
27  the security offered to protect customer and public information.  Should the domain name
28  be sold or otherwise transferred to a third party who does not have the infrastructure or

15.

GREENBERG TRAURIG, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

1   expertise to offer the secure data services offered by the Plaintiff, or even if the domain

2   name were retained by the defendant to use for similar services, there is a strong chance

3   that customer and public information will not be safe.   Because there is a chance that

4   consumers' personal information will not be safe when given to Defendant, or to third

5   parties, it is imperative that consumers not be led into believing that they are dealing with

6   Plaintiff's reputable businesses, when, in fact, they are not.

7        **E.     This Court Should Only Require Nominal Security.**

8        In the event that the Court requires that a bond or other security be posted by

9   Plaintiff, Plaintiff requests that the Court set an amount that is no greater than $100.

10   Plaintiff is well established in Nevada.   During the pendency of this litigation, Defendant

11   would not suffer from having the registration for the Infringing Domain Name maintained

12   with Plaintiff's registrar for the pendency of the litigation.

13        **F.     In Addition to the Notice Requirements of Rules 4 and 5 of the Federal
14            Rules of Civil Procedure, Notice Should be Permitted Via E-Mail.**

15        Plaintiff requests that this Court permit service of the summons, complaint, motion,

16   temporary restraining order and notice of the hearing on the preliminary injunction by e-

17   mail, in addition to effectuating service as mandated by Fed. R. Civ. P. 4 and 5.   Otherwise,

18   a just, speedy and inexpensive determination of the preliminary injunction cannot be

19   achieved. *See* Fed. R. Civ. P. 1.

20        If the Court grants Plaintiff's request for a temporary restraining order, the order will

21   only remain in effect for ten (10) days and the hearing on the preliminary injunction must

22   occur "at the earliest possible time" prior to the expiration of the temporary restraining

23   order.   Fed. R. Civ. P. 65(b).   The process of serving Defendant with the summons,

24   complaint, motion, temporary restraining order and order for hearing on the preliminary

25   injunction could exceed the ten (10) day period and, most likely, not afford Defendant timely

26   notice of the temporary restraining order and the preliminary injunction.   And, as explained

27   above, Plaintiff would be irreparably harmed if the temporary restraining order were to

28   expire before it could be converted into a preliminary injunction.   Therefore, in addition to

GREENBERG TRAURIG, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

16.

1   regular service of the complaint, summons, motion and orders under Fed. R. Civ. P. 4 and

2   5, service by e-mail would ensure prompt notice to Defendant and would be reasonably

3   calculated to provide sufficient and adequate notice to Defendant.

4   **IV.   CONCLUSION**

5         Based upon the foregoing Points and Authorities, Plaintiff has shown that it meets

6   either of the two alternative tests developed by the United States Court of Appeals for the

7   Ninth Circuit for entitlement to injunctive relief.  Plaintiff has demonstrated that success as

8   to each or the Relevant Claims is, at the very least, probable.  Alternatively, Plaintiff has

9   raised serious questions and shown that the balance of hardships tips in its favor.

10   Accordingly, Plaintiff respectively requests that the Court grant its Motions for a Temporary

11   Restraining Order and for a Preliminary Injunction pending adjudication of this matter on

12   the merits.

13         DATED:  November 9, 2011.

14

15                              GREENBERG TRAURIG, LLP

16                              Lauri S. Thompson (Bar No. 6846)

17                              Laraine Burrell (Bar No. 8771)
                             Shauna Welsh (Bar No. 11320)

18                              3773 Howard Hughes Parkway
                             Suite 400 North

19                              Las Vegas, Nevada 89169
                             Counsel for Switch Communications Group

20

21

22

23

24

25

26

27

28

GREENBERG TRAURIG, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

17.

# EXHIBIT 1

1  LAURI S. THOMPSON, ESQ.
   Nevada Bar No. 6846
2  thompsonl@gtlaw.com
   LARAINE BURRELL, ESQ.
3  Nevada Bar No. 8771
   burrelll@gtlaw.com
4  SHAUNA WELSH, Esq.
   Nevada Bar No. 11320
5  walshs@gtlaw.com
   GREENBERG TRAURIG, LLP
6  3773 Howard Hughes Parkway
   Suite 400 North
7  Las Vegas, Nevada 89169
   Telephone: (702) 792-3773
8  Facsimile: (702) 792-9002
   *Counsel for Plaintiff,*
9  *Switch Communications Group, LLC.*

10

11                   **UNITED STATES DISTRICT COURT**
                          **DISTRICT OF NEVADA**

12  Switch Communications Group,        Case No.:
    LLC, a Nevada limited liability
13  company;

14                Plaintiff,            **DECLARLATION OF LARAINE**
                                        **BURRELL, IN SUPPORT OF**
                                        **PLAINTIFF'S MOTION FOR *EX PARTE***
15  v.                                  **TEMPORARY RESTRAINING ORDER**

16

17  Dorian Banks, an individual,

18                Defendant.

19

20        I, LARAINE BURRELL, declare under penalty of perjury under the laws of the United

21  States that the facts contained herein are of my personal knowledge, and if called upon, I could and

22  would competently testify to them.  This declaration is submitted in support of Plaintiff's

23  Application for Temporary Restraining Order and Motion for Preliminary Injunction.

24        1.      I am an associate with Greenberg Traurig, counsel for Plaintiff in the above-

25  referenced matter.  I have been employed by Greenberg Traurig, Las Vegas, or its predecessor-in-

26  interest, Quirk & Tratos, since May of 2003.

27        2.      This Declaration is submitted in support of Plaintiff's *ex parte* Motion for Temporary

28  Restraining Order.

LV 419,583,853v1 11-9-11

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone (702) 792-3773
Facsimile (702) 792-9002

3.     Greenberg Traurig has filed hundreds of anti-cybersquatting actions since the passage of the Anti-cybersquatting Consumer Protection Act (the "ACPA"), 15 U.S.C. § 1125(d)(1)(A), and I personally have filed over fifty anti-cybersquatting actions.

4.     I have requested an *ex parte* Temporary Restraining Order in each anti-cybersquatting action I have filed.

5.     Following the passage of the ACPA, plaintiffs quickly realized that providing notice to the Defendant of the lawsuit before the domain name in question was beyond the Defendant's immediate grasp resulted in the Defendant transferring that domain name to another registrant and/or another registrar.  Such action by the Defendant negates the court's jurisdiction and requires the filing of a second lawsuit after the Plaintiff spends additional time and fees locating the domain name.

6.     In the instant matter, Defendant registered and is using, and is trying to sell in bad faith the <switch.net> domain name (the "Infringing Domain Name") and Plaintiff's registered trademarks.

7.     Plaintiff is seeking an *ex parte* Temporary Restraining Order from this Court.

8.     Plaintiff requires the Temporary Restraining Order to be granted *ex parte* because as soon as Defendant receives notice of this action, it could easily and nearly instantaneously transfer the registration of the Infringing Domain Name from the current registrar to any number of other registrars located outside the United States as well as to other registrants unwilling to abide by this Court's orders.

9.     If Defendant transfers the Infringing Domain Name prior to the hearing on the Motion for Temporary Restraining Order, Plaintiff would be deprived of the ability to recover registration of the Infringing Domain Name and the ability to enforce its intellectual property rights.

10.     Therefore, notice to the Defendant prior to the locking and transfer of the domain name, as requested in the Motion for Temporary Restraining Order would result in irreparable injury to Plaintiff.

. . .

. . .

1   11.  Because notice to the Defendant would result in immediate irreparable injury to the

2  Plaintiff, the Plaintiff has made no effort to notify the Defendant of its request for a Temporary

3  Restraining Order.

4   DATED: November 9, 2011

5

6

7       Laraine Burrell

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone (702) 792-3773
Facsimile (702) 792-9002

# EXHIBIT 2

Lauri S. Thompson (Bar No. 6846)
Laraine Burrell (Bar No. 8771)
Shauna Welsh (Bar No. 11320)
3773 Howard Hughes Parkway
Suite 500 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

Counsel for Switch Communications Group LLC

## UNITED STATES DISTRICT COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| Switch Communications Group, LLC, a Nevada limited liability company,<br><br>        Plaintiff,<br><br>v.<br><br>Dorian Banks, an individual,<br><br>        Defendant. | Case No.<br><br>**DECLARATION OF THOMAS MORTON IN SUPPORT OF PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION** |

I, Thomas Morton, declare under penalty of perjury under the laws of the United States that the facts contained herein are of my personal knowledge, and if called upon, I could and would competently testify to them.

1.     This declaration is submitted in support of Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction.

2.     I am the general counsel, and I have been employed by Switch Communications Group L.L.C. ("Switch") since April 1, 2008.

3.     Switch builds and operates the industry leading data center and technology ecosystems.

4.     Switch is well known within the industry.  Switch provides superior colocation, connectivity, and cloud services for national and multi-national companies, government agencies and other organization conducting mission critical business.  When the latest

planned expansion is completed, Switch will operate one of the largest commercially available and independent technology ecosystems in the world.

     5.     Switch owns a number of SWITCH marks, and has obtained federal mark registrations for the SWITCH Marks, including but not limited to:

     (a)     SWITCH COMMUNICATIONS GROUP for providing telecommunications connections to a global computer network and colocation services (U.S. Reg. No. 3,229,168);

     (b)     SWITCH T-SCIF for providing telecommunications connections to the internet and colocation services (U.S. Reg. No. 3,547,908);

     (c)     SWITCH WDMD for colocation services (U.S. Reg. No. 3,540,816),

     (d)     SWITCHNAP for providing telecommunications to the internet and colocation services (U.S. Reg. No. 3,547,909),

     (e)     SWITCHNAP WORLD for providing telecommunications connections to the internet and colocation services (3,880,400),

     (f)     SWITCHFORCE, for security guard services, designing security systems for others, security surveillance services, guard night-watch services, alarm center services, mobile and stationary security guard services, alarm rescue services, alarm rescue services; photographic surveillance services, detective agencies; interior decoration consultation, engineering and legal counseling services; development of bar-code systems; computer programming for others; computer software design for others, up-dating and maintenance of computer software (U.S. Reg. No. 3,942,121),

     (g)     SWITCHSAFE for computer disaster recovery services (U.S. Reg. No. 3,946,128),

     (h)     SWITCHWORKS for design and installation of computer hardware and software systems for others (U.S. Reg. No. 3,942,079),

      (i)    SWITCHMOD for colocation facility development services (U.S. Reg. No. 3,984,525),

      (j)    SWITCH L.D.C. for providing management of building operation systems; computer software and hardware for energy use management, air conditioning and energy usage monitoring and management systems (U.S. Reg. No. 3,984,524), and

      (k)    SWITCHMACRO-MOD for colocation facility development services (U.S. Reg. No. 3,984,966).

None of these federal mark registrations has been abandoned, canceled or revoked.

      6.    Since Switch began operating in 2003, Switch has continuously used the SWITCH marks in connection with advertising and promoting the SWITCH brand in the United States and around the world.

      7.    Switch has spent substantial sums of money to advertise and promote the SWITCH Marks in print, broadcast media and on the Internet through the Switch web site, accessible throughout the United States and around the world at <switchnap.com>. In addition, Switch has made extensive use of the SWITCH Marks on, among other things, providing telecommunications to the internet and colocation services, and security guard services, designing security systems for others, and security surveillance services.

      8.    Based upon its federal trademark registrations and extensive use, Switch owns the exclusive right to use the SWITCH Marks in connection with services related to owning and operating technology ecosystems.

      9.    No other entities are legitimately using any of the SWITCH marks in the United States for the provision of a data center and technology ecosystem. Further, Plaintiff continuously takes steps to ensure that any infringing uses of its federally registered marks cease immediately.

      10.    Plaintiff's mark was famous prior to Defendant's registration and commercial use of the Infringing Domain Names <switch.net> on October 15, 2011.

11.   I was notified directly by a Switch employee that she was contacted by Defendant by phone on or about October 31, 2011 for the purpose of offering to sell the domain name <switch.net> to Switch.   I then contacted the Defendant directly and had several email discussions with the Defendant in which he continued to offer to sell the domain name to Switch for approximately $3,700. Attached as **Exhibit 1** are accurate copies of the emails between myself and the Defendant.

12.   Defendant also informed me in his emails that if Switch did not purchase the domain name from him, he would sell it to another group.  See **Exhibit 1** attached.

Executed this ⎽⎽⎽ 09th day of November, 2011, at Las Vegas, Nevada.

Thomas Morton

# EXHIBIT 1

## Burrell, Laraine (Assoc-LV-LT)

| | |
|---|---|
| **From:** | Dorian Banks [dbanks@metrobridge.com] |
| **Sent:** | Wednesday, November 02, 2011 11:56 AM |
| **To:** | Thomas Morton |
| **Cc:** | Brian Boles |
| **Subject:** | RE: Domain Name Switch.net |

That does sound reasonable but I am better off to take money in hand with another group or even defend it myself.

With your offer I receive either $0 or $3700.
With another group I receive $3700.
Defending myself I either retain the domain or lose approx $9700.

$3700 for this domain is an amazing price. You guys can easily defend the UDRP with one link:

http://tess2.uspto.gov/bin/showfield?f=doc&state=4009:n2q4sm.2.1

So, that being said, if you want to take over my Enom account containing the switch.net domain for a payment of $3700 right now, I will do that. If not I understand and will pursue one of the other options I have.

Dorian

_____

From: Thomas Morton [tmorton@switchlv.com]
Sent: Wednesday, November 02, 2011 11:48 AM
To: Dorian Banks
Cc: Brian Boles
Subject: [SPAM] RE: Domain Name Switch.net

Dorian,

Apparently title cannot be transferred to us at this time. However, we remain interested in the Domain Name and are willing to work with you on resolution of this issue. Here is what I propose:

1.    We will undertake defense/resolution of the WIPO action at our expense.
2.    The current escrow will stay open pending the resolution of that action. This way you are assured of payment once the domain is cleared.
3.    We will point the domain to our servers - which should help the defense of the action.

Does this sound reasonable and fair?

All the best,

Thomas
Thomas Morton

General Counsel
Switch
702-267-6739
tmorton@switchnap.com


-----Original Message-----
From: Dorian Banks [mailto:dbanks@metrobridge.com]
Sent: Wednesday, November 02, 2011 11:37 AM
To: Dorian Banks; Thomas Morton
Cc: Brian Boles
Subject: RE: Domain Name Switch.net

I have verified with escrow.com that they will handle this transaction even with the registrar freeze in place (they have done so before).

Please let me know asap as if you want to cancel I now have another group that will take and defend the name based on their foreign trademark of "Switch".

Thanks,

Dorian


_____

From: Dorian Banks
Sent: Wednesday, November 02, 2011 11:24 AM
To: Thomas Morton
Cc: Brian Boles
Subject: RE: Domain Name Switch.net

Well, turns out I cannot push the domain to your account as it is a "registrar freeze" state.

The only alternative is to give you my Enom account info that contains that domain and then you can change the password on it...essentially making it your own at that time.

The Whois record appears frozen as well.

Let me know if this would satisfy the transaction with you or you choose to abandon it.

Thanks,

Dorian


_____

From: Thomas Morton [tmorton@switchlv.com]
Sent: Wednesday, November 02, 2011 11:14 AM
To: Dorian Banks

Cc: Brian Boles
Subject: [SPAM]  RE: Domain Name Switch.net

Our user name is Redline1973.  Just let me know if you need anything else.

All the best,

Thomas
Thomas Morton
General Counsel
Switch
702-267-6739
tmorton@switchnap.com


-----Original Message-----
From: Dorian Banks [mailto:dbanks@metrobridge.com]
Sent: Wednesday, November 02, 2011 10:39 AM
To: Thomas Morton
Subject: RE: Domain Name Switch.net

Can you give me the name of your Enom account and I can 'push' the domain in to it?  This is by far the easiest process.

Thanks,


Dorian




_____
From: Thomas Morton [tmorton@switchlv.com]
Sent: Wednesday, November 02, 2011 10:01 AM
To: Dorian Banks
Subject: [SPAM]  RE: Domain Name Switch.net

You should be receiving an updated notice from Escrow.com.

All the best,

Thomas
Thomas Morton
General Counsel
Switch
702-267-6739
tmorton@switchnap.com


-----Original Message-----
From: Dorian Banks [mailto:dbanks@metrobridge.com]
Sent: Wednesday, November 02, 2011 9:51 AM
To: Thomas Morton

Subject: RE: Domain Name Switch.net

I received your escrow.com transaction but you did not follow my instructions below so I cancelled the transaction.

Dorian

_____

From: Thomas Morton [tmorton@switchlv.com]
Sent: Wednesday, November 02, 2011 6:25 AM
To: Dorian Banks
Subject: [SPAM]  Re: Domain Name Switch.net

Dorian,

Thank you. Can you please send me a copy or link to the current domain ownership dispute filings. Thanks so much.

Sent from my iPhone

On Nov 2, 2011, at 12:48 AM, "Dorian Banks" <dbanks@metrobridge.com> wrote:

> I apologize for the delay, had very late meetings and was not near a computer.
>
> Please initiate an escrow.com transaction for $3700 with transaction fees payable by the purchaser with a 2 day inspection period.  The email address for my account is dorianbanks@gmail.com  which matches the WHOIS for the domain.
>
> Thanks Thomas!
>
>
> Dorian
>
>
>
> _____
> From: Thomas Morton [tmorton@switchlv.com]
> Sent: Tuesday, November 01, 2011 5:33 PM
> To: Dorian Banks
> Cc: Missy Young; Brian Boles
> Subject: RE: Domain Name Switch.net
>
> Dorian,
>
> It was a pleasure to speak with you this evening.  This email will confirm Switch's willingness to purchase the switch.net domain name for $3,700 (plus ancillary acquisition costs of up to $200).  I will look forward to your confirming email this evening.
>
> As discussed during our call, we can use Escrow.com tomorrow morning to complete the transaction.  Alternatively, since Enom is your current registrar we can also utilize their transfer process.
>
> I have looped in Brian Boles who will be able to assist with the technical aspects of the transfer.
>

> All the best,
>
> Thomas
> Thomas Morton
> General Counsel
> Switch
> 702-267-6739
> tmorton@switchnap.com
>
> From: Thomas Morton
> Sent: Tuesday, November 01, 2011 5:13 PM
> To: 'dbanks@metrobridge.com'
> Cc: Missy Young
> Subject: Domain Name Switch.net
>
> Mr. Banks,
>
> Good afternoon.  Per my voicemail, I am contacting you to follow up on your correspondence with Missy Young of
Switch regarding the potential transfer of the domain name Switch.net.  Could you please call me at your convenience
to discuss this item?  My contact information is set forth below for your reference.
>
> All the best,
>
> Thomas
> Thomas Morton
> General Counsel
> Switch
> 702-267-6739
> tmorton@switchnap.com<mailto:tmorton@switchnap.com>
>

# EXHIBIT 3

Truth

in Technology



# THE SUPERNAPS ... THE WORLD'S BEST DATA CENTERS

 **WHY SWITCH?**

 **TIER "ELITE"**

 SUPER|NAPS COLOCATION

 ecolocation

 **CONNECTIVITY**

 **ALL THINGS SWITCH**

 switch|CLOUD ICE

 switch|MUD

 **INDEPENDENCE AS A SERVICE**

 **VIDEOS**

NEWSROOM

CONTACT US

AUP

Copyright © 2011, Switch, All Rights Reserved.

# EXHIBIT 4

# Better-Whois.com

## ...SEARCH ALL DOMAIN REGISTRARS

Home page
Link-to-Us
Contact Us

## switch.net is

# Reserved

Registrar: ENOM423 INCORPORATED

**Status:**
clientTransferProhibited

**Domain options / additional information:** *(Click below to expand)*

**+ if you own this domain...**

**+ if you are trying to register/buy this domain...**

**+ if you are researching this domain...**

[Querying whois.verisign-grs.com]
[whois.verisign-grs.com]Whois Server Version 2.0Domain names in the .com and .net domains can now be registered
with many different competing registrars. Go to http://www.internic.net
for detailed information.  Domain Name: SWITCH.NET
   Registrar: ENOM423 INCORPORATED
   Whois Server: whois.enom423.com
   Referral URL: http://www.enom423.com
   Name Server: No nameserver
   Status: clientTransferProhibited
   Updated Date: 19-oct-2011
   Creation Date: 15-oct-2011
   Expiration Date: 15-oct-2012NOTICE: The expiration date displayed in this record is the date the
registrar's sponsorship of the domain name registration in the registry is
currently set to expire. This date does not necessarily reflect the expiration
date of the domain name registrant's agreement with the sponsoring
registrar.  Users may consult the sponsoring registrar's Whois database to
view the registrar's reported date of expiration for this registration.

Sponsored Link

### Don't let your customers forget you! Aweber can help...
Automate your business and boost sales with this easy to use service.

[Querying whois.enom423.com]
[whois.enom423.com]
=-=-=

Domain name: switch.net

Registrant Contact:

  Dorian Banks ()

  Fax:

### Featured Registrar

Register a domain name
with **Register.com** for
only $20. Includes:

- Free starter web site
- Free web forwarding
- Free e-mail forwarding
- Free domain locking
- Name portfolio manager
- Dynamic DNS service

**Click here for
discounted rate.**

**Domain Registrars**
@Com Technology LLC
000Domains.com
007Names, Inc.
1 eNameCo
123 Easy Domain Names
123 Registration, Inc.
1dni.com
1st Domain.net
4Domains.com
Active ISP ASA
Address Creation
Aitdomains.com
Alice's Registry, Inc.
Alldomains.com, Inc.
America Online, Inc.
Ascio Technologies, Inc.
ATLNTD.com
AWRegistry
BB Online UK Ltd

Suite 918
Vancouver, British Columbia V6E2Y3
CA

Administrative Contact:

    Dorian Banks (dorianbanks@gmail.com)
    +1.6043516200
    Fax:
    1030 W. Georgia Street
    Suite 918
    Vancouver, British Columbia V6E2Y3
    CA

Technical Contact:

    Dorian Banks (dorianbanks@gmail.com)
    +1.6043516200
    Fax:
    1030 W. Georgia Street
    Suite 918
    Vancouver, British Columbia V6E2Y3
    CA

Status: Locked

Name Servers:
    dns1.name-services.com
    dns2.name-services.com
    dns3.name-services.com
    dns4.name-services.com
    dns5.name-services.com

Creation date: 15 Oct 2011 11:32:00
Expiration date: 15 Oct 2012 11:32:00


Get Noticed on the Internet! Increase visibility for this domain name by listing it at www.whoisbusinesslistings.com
=-=-=-=
The data in this whois database is provided to you for information
purposes only, that is, to assist you in obtaining information about or
related to a domain name registration record. We make this information
available "as is," and do not guarantee its accuracy. By submitting a
whois query, you agree that you will use this data only for lawful
purposes and that, under no circumstances will you use this data to: (1)
enable high volume, automated, electronic processes that stress or load
this whois database system providing you this information; or (2) allow,
enable, or otherwise support the transmission of mass unsolicited,
commercial advertising or solicitations via direct mail, electronic
mail, or by telephone. The compilation, repackaging, dissemination or
other use of this data is expressly prohibited without prior written
consent from us.

We reserve the right to modify these terms at any time. By submitting
this query, you agree to abide by these terms.
Version 6.3 4/3/2002

| www.⎮_____ | **Search** ⎮ |
|---|---|
| Searches shared database registry and queries appropriate registrar. | |